Civil Action No.: 7:15-cv-00084-BO

---

|  |  |  |
|---|---|---|
| TED D. SPRING, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | **SECOND AMENDED COMPLAINT** |
| THE BOARD OF TRUSTEES OF CAPE FEAR | : | **(Jury Trial Demanded)** |
| COMMUNITY COLLEGE, JOHN R. BABB, | : | |
| JONATHAN BARFIELD, LOUIS A. BURNEY, | : | |
| JR., ANN M. DAVID, A.D. "ZANDER" GUY, | : | |
| JASON C. HARRIS, SAMUEL R. IBRAHIM, | : | |
| CHARLES R. KAYS, JOHN F. MELIA, MARY | : | |
| LYONS ROUSE, DAVID L. RAY, WILLIAM R. | : | |
| TURNER, JR., and F. MATSON WHITE, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

**NOW COMES** the Plaintiff, Ted D. Spring, by and through undersigned counsel, complaining of the Defendants The Board of Trustees of Cape Fear Community College, and its individual members in their official capacities, and submits this Second Amended Complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure, and alleges and says as follows:

### NATURE OF THE CASE

1.      This is a civil action seeking compensatory damages for breach of contract, violation of Plaintiff's rights under the Constitution of the State of North Carolina, and for injunctive relief pursuant to 42 U.S.C. 1983 for the deprivation of the Plaintiff's civil rights, specifically Plaintiff's Constitutional Right to Due Process.

## PARTIES

2.     Plaintiff Ted D. Spring (hereinafter "Dr. Spring" or "Plaintiff") is a citizen and resident of New Hanover County, North Carolina

3.     Defendant, The Board of Trustees of Cape Fear Community College (hereinafter, the "CFCC Board" or "Defendant") is a body politic and corporate, organized and existing under the laws of the State of North Carolina, capable of suing and being sued, and having, upon information and belief, no immunity to Plaintiff's claims, and otherwise having waived any immunity to Plaintiffs claims.

4.     The CFCC Board exercises its powers on behalf of the institution Cape Fear Community College, a community college organized and existing pursuant to the laws of the State of North Carolina, being located in New Hanover County, North Carolina (the "College").

5.     The CFCC Board members John R. Babb, Jonathan Barfield, Louis A. Burney, Jr., Ann M. David, A.D. "Zander" Guy, Jason C. Harris, Samuel R. Ibrahim, Charles R. Kays, John F. Melia, Mary Lyons Rouse, David L. Ray, William R. Turner, Jr., and F. Matson White are named as Defendants in their official capacities as CFCC Board members for purposes of prospective injunctive relief.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over all the parties and matters in controversy herein, and they are properly before this court pursuant to 28 U.S.C. § 1331, 1376, and 1446.

7.     Defendant has waived any immunity to suit in this Court available pursuant to the Eleventh Amendment to the United States Constitution by its voluntary removal of this action.

8.     Venue is proper under 28 U.S.C. 1441.

**GENERAL ALLEGATIONS**

9.    After conducting a nationwide search for a successor to Cape Fear Community College's long-time retiring President, Dr. Spring was unanimously selected by the CFCC Board during the Summer of 2012 to serve as Cape Fear Community College's President pursuant to the provisions of an Employment Agreement that the CFCC Board committed to negotiate with Dr. Spring.

10.    In announcing his selection, then Chair of the CFCC Board Barren Nobles explained that the CFCC Board was impressed by Dr. Spring's experience, enthusiasm, and commitment to the mission of the College.  "The presidential search process has identified an excellent choice for CFCC's next president.  Dr. Spring is an experienced, proven leader who possesses passion, integrity and vision.  Given his past accomplishments, there is no doubt that he will be a valuable asset to our community.  The board unanimously agrees that Dr. Spring is the clear choice to lead CFCC to the next level of success."

11.    At the time that Dr. Spring was offered the position as President of the College, he had accumulated over four decades of experience in higher education, and was the sitting president at New River Community and Technical College in West Virginia, and upon information and belief, at the time that the Defendant offered him employment as President of the College, his position as president at New River was safe and secure.

12.    But for the promises and representations  made by the Defendant and the College prior to  the execution of the Employment Agreement and thereafter, and the express provisions of the Employment Agreement, set forth below, Dr. Spring would not have left his position as president at New River.  The Chair of the New River Community and Technical College Board of Governors, in announcing Dr. Spring's departure, stated that "Dr. Spring has provided

exceptional leadership for New River during a critical time in its development. He has helped lay the groundwork for future growth, and we wish him well in his new position."

13.     Dr. Spring has been a whistleblower and staunch opponent of academic fraud and unethical practices in higher education, having reported such practices while employed as vice president at Shelton State Community College in Alabama, where he was fired by Shelton State's president after having exposed and reported illegal and unethical behavior, including academic fraud, occurring at Shelton State.

14.     After Dr. Spring was fired, he brought an action against Shelton State's president, contending that he had been denied his rights under the state and/or United States Constitution because his firing was related to his having disclosed illegal and unethical behavior, including academic fraud, a fact that Shelton State's president admitted at trial. Upon that admission, a United States District Court Judge directed a verdict in favor of Dr. Spring, finding that there was no dispute that he had been terminated by Shelton State's President for disclosing or attempting to disclose fraud and illegal activity. A jury then awarded Dr. Spring $2.5 million by reason of the damages inflicted upon Dr. Spring for the violation of his constitutional rights.

15.     More than a dozen individuals, some of whom had direct ties to Shelton State Community College, including the wife of former Shelton State President Thomas Umphrey, who unlawfully terminated Dr. Spring, pled guilty or were convicted or indicted in a probe of the system after Spring's whistleblowing activities.

16.     The CFCC Board and the members of the College staff were fully aware of Dr. Spring's prior employment at Shelton State, and his whistleblowing activities and resulting litigation prior to approval of his appointment by the CFCC Board. Most importantly, the CFCC Board knew that Dr. Spring was not one who would bend to political pressure from those who

would seek to distract him from his charge to provide quality educational and training opportunities through the College.

17.     Prior to the date that Dr. Spring began his employment as President of the College, Dr. Spring and the Defendant negotiated and agreed upon the terms of his Employment Agreement, which included, but were not limited to, his salary; his and the CFCC Board's duties and responsibilities; the College's encouragement of continuing professional growth opportunities for Dr. Spring, as President of the College, through his participation in programs and activities that would serve to improve his capacity to perform his responsibilities for the College, including the College's obligation to pay for the necessary and reasonable membership, tuition, travel and subsistence expenses entailed in his participation in those programs and activities.

18.     During the negotiations, Dr. Spring informed the College's representative negotiating his Employment Agreement that his current employer paid the reasonable and necessary costs for his wife to attend certain designated conferences with him, and Dr. Spring was assured that these costs could and would be covered by the College through "discretionary funds" that were available for expenses like this. In fact, the College specifically confirmed the availability of discretionary funds for Dr. Spring and his wife to attend such conferences in advance.

19.     As a result of his selection as President of Cape Fear Community College, Dr. Spring and the CFCC Board entered into a written Employment Agreement, which was executed on behalf of the CFCC Board on August 28, 2012. A true and accurate copy of the Employment Agreement is attached hereto as Exhibit A and incorporated herein by reference.

20.     In addition to the provisions set forth above, the Employment Agreement called for the reimbursement to Dr. Spring "according to College policy for incidental business expenses that are reasonable and necessary to the operation of the College and the performance of the President's duties under this Agreement", which included the reasonable and necessary costs of transportation while conducting the business of the College.

21.     The Employment Agreement is for a stated definite initial term, ending on October 31, 2015.

22.     Further, the Employment Agreement contemplates the extension or renewal of the term, and required that Dr. Spring and the CFCC Board meet "no less than ninety (90) days prior to the expiration of the Original Term of [the Employment Agreement] to discuss a new employment contract or an extension or renewal of [it]."

23.     The Employment Agreement provides for an annual evaluation of Dr. Spring's performance during the spring semester of each year, in accordance with the provisions of the North Carolina Administrative Code.  Prior to January 22, 2015, each annual evaluation conducted by the CFCC Board of Dr. Spring's performance was satisfactory and did not give rise to any basis to terminate the Employment Agreement.  At various times throughout 2014, Dr. Spring's performance was lauded by CFCC Board Chair Jason Harris and Vice-Chair Bill Turner, who provided nothing but positive feedback with regard to his performance, with Mr. Harris referring to Dr. Spring as a "rockstar" and complimenting him on his interaction with the Wilmington community.  Dr. Spring's 2014 evaluation was conducted by Mr. Harris, who informed Dr. Spring that his performance was satisfactory but, contrary to the provisions of the North Carolina Administrative Code, never provided a written evaluation.

24.     The Employment Agreement also contains a limited provision for early termination of Dr. Spring's employment for specified causes.   However, to invoke that provision, the CFCC Board was required to provide Dr. Spring with "written notice explaining the basis for termination and [Spring's] right to a hearing," including "the right to be represented at the hearing by a legal representative" and "the right to confront and cross-examine any adverse witnesses."

25.     Dr. Spring faithfully and dutifully performed each of his obligations under the provisions of the Employment Agreement from the date of his hiring until January 22, 2015.

26.     Dr. Spring's tenure as President at Cape Fear Community College was filled with much change and transition.  Dr. Spring was faced with having to hire and replace senior members of the College's staff.  During Dr. Spring's tenure, the College completed and moved into the Union Station building; broke ground and commenced construction on the Fine Arts Building; undertook the design of the Emerging Technologies buildings and spearheaded the approval process for the placement of the bonds; completed the Surf City, North Carolina campus; opened a new conference center; purchased property and renovated a building for a new police station; purchased the new Cape Hatteras, a research vessel for the Marine Science program; and increased grant funds to the College and contributions to the College Foundation.  Dr. Spring also started two capital campaigns and expanded the College's outreach efforts and built stronger relationships with the business community and UNC-Wilmington.

27.     During his tenure as President of the College, Dr. Spring did not fail to substantially perform the duties of President of the College.

28.     During his tenure as President of the College, Dr. Spring did not engage in any conduct or activity that would materially injure the reputation or operations of the College.

29.     Given his performance evaluations, repeated commendations on his outstanding work from CFCC Board Chair Jason Harris, and the express terms of the Employment Agreement, Dr. Spring had a legitimate expectation that his Employment Agreement would be renewed upon its expiration.

30.     Each community college in the State of North Carolina is governed by a board of trustees consisting of 13 members, with four (4) trustees elected by the county board of education; four (4) trustees elected by the board of county commissioners; four (4) trustees appointed by the Governor of North Carolina; and a final member that would be the president of the community college's student government association.

31.     The powers and duties of the CFCC Board are limited to those contained within the provisions of N.C.G.S. §115D-20, and include the authority to "elect" but one employee, namely, the President of the College.   The CFCC Board does not have authority over any other personnel employed at the College, except "upon nomination by the president…" and has no authority over fixing or approving the budget for the College.

32.     The CFCC Board, therefore, is largely made up of "political appointees." As would become evident to Dr. Spring by the Spring of 2014, politics and the political and social agendas created or mandated by certain members of the CFCC Board versus the national and regional agenda that is higher education at the community college level in North Carolina made for visible conflicts of interest.

33.     Woody White is a member of the CFCC Board and an elected member of the New Hanover County Board of Commissioners since 2012.

34.     Mr. White is a politician, having been elected to the New Hanover County Board of Commissioners. Mr. White brought his political views to the CFCC Board, joined by other CFCC Board members with similar political and social views.

35.     The New Hanover County Board of Commissioners provides funding to the College, and Mr. White's powers and duties as a member of the Board of Commissioners are different than his powers and duties as a member of the CFCC Board, resulting in numerous conflicts of interest for Mr. White, who as a member of both the Board of Commissioners and the CFCC Board, believed himself akin to a "Super Board Member", attempting to wield his power as Chair of the Board of Commissioners during meetings of the Board of Trustees of the College and acting in the capacity as a member of the Board of Commissioners.

36.     In 2008, voters in New Hanover County approved $164 million dollars in bonds for construction and improvements at the College, and prior to Dr. Spring's appointment as President, the College and Dr. Spring's predecessor had allocated and expended approximately $124 million dollars on projects, including the Union Station building, the Humanities & Fine Arts Building and a new parking deck, with the final amounts appropriated to be expended on the construction of an Advanced & Emerging Technologies Center on the College's North Campus, as well as renovations to several downtown technical buildings, a project which focuses on job training and will allow the College to expand several job-training programs already in its curriculum and create space for new programs, including a veterinarian tech program.

37.     Despite the approval by voters and the resulting benefits to the College and the community, after his appointment to the CFCC Board, Mr. White began publically questioning whether the CFCC Board and the College had properly managed bond funds, questioned whether these additional facilities at the College were necessary or whether the Board of County

Commissioners could afford to issue the bonds that voters had approved, all in furtherance of the fiscally conservative agenda upon which he had attempted to build his political career.

38.     Mr. White became the epitome of a rogue trustee, as that term is defined in published studies, openly and publicly criticizing staff members and other CFCC Board members for their lack of oversight over the College's finances; placing his partisan political agendas over the interests of the College; attempting to manipulate individuals and situations to his advantage; and departing from projects that further the interests of the College in favor of agendas that favored his political future.  After one such tirade by Mr. White in the Spring of 2014, several of Dr. Spring's staff members expressed outrage to Dr. Spring about Mr. White's public comments, feeling as if Mr. White had humiliated them in public in front of the CFCC Board, other staff members and members of the press.  The College's public spokesperson, David Hardin, asked Dr. Spring for permission to respond to Mr. White's public comments, and Dr. Spring consented, with Mr. Hardin rebutting Mr. White's statements and lauding staff members for their good work.

39.     After Mr. Hardin's public comments, Mr. White called Dr. Spring and informed him that he was "angry" about Mr. Hardin's comments, telling Dr. Spring that "we can't have David Hardin making statements" contrary to what CFCC Board members say, and demanded that Dr. Spring "fix this" and "control" Mr. Hardin's comments in the news, or Mr. White threatened, "there will be consequences." From and after that threat by Mr. White, Dr. Spring felt that his future could be in doubt due to the actions of this rogue trustee.

40.     Dr. Spring informed the CFCC Board Chair, Barren Nobles, of Mr. White's threats, together with other members of his staff.  Mr. White's public criticisms of the CFCC Board and staff, coupled with his subsequent threats of "consequences" created an environment

among the CFCC Board that was different than the congenial working group that Dr. Spring became employed by in 2012. Instead, Mr. White created an environment in which staff members and other CFCC Board members became fearful of openly disagreeing with Mr. White and the retaliation that he would undertake.

41. Beginning in the Fall of 2014, the CFCC Board began the process of discussing the award of a contract for the construction of the Advanced and Emerging Technologies Center, and once again, during these discussion, Mr. White began openly criticizing the need for the new building, contending that enrollment at the College had fallen "flat" from the projections that were a part of a Facilities Master Plan for the College from 2007, with the issue ultimately not being moved forward at the time by the Facilities Committee. Dr. Spring and other staff members questioned the accuracy of any enrollment numbers that show a "flat" progression of enrollment at the College, citing statistics from the State of North Carolina that showed that enrollment, while projected to increase by 31% when the Facilities Master Plan was adopted, had actually increased 37%, with the Advanced and Emerging Technologies Center being vital for the College to have the space to continue increasing the programs that it offered and offer additional training programs for employers in Southeastern North Carolina.

42. In an effort to get Mr. White to "back off", other members of the CFCC Board informed Dr. Spring that they "went along" with Mr. White's attempts to table discussion of the Advanced and Emerging Technologies Center.

43. On or about November 20, 2014, the CFCC Board voted to move forward with the construction of the Advanced and Emerging Technologies Center, with Mr. White being the only vote against the project, contending that the need for the space had not been justified. However, as Mr. White reminded the CFCC Board, the ultimate decision would rest with the

Board of County Commissioners, which he then chaired, and he promised to "reignite" the discussion regarding the need for the project when the issue came before the Board of County Commissioners, even though he knew this discussion was not in the best interests of the College.

44.     By the fall of 2014, the CFCC Board had a new chair, Jason Harris, and Dr. Spring shared with Mr. Harris the threats that he had received from Mr. White during the Spring of 2014.  Mr. Harris indicated that Mr. White was a "personal friend" and that it would not be "good" for Mr. Harris, politically (Mr. Harris had previously tried and failed to be elected to public office), to try to "rein in" Mr. White.  Dr. Spring informed Mr. Harris that if he were not willing to speak with Mr. White, that Donnie Hunter, CEO of the North Carolina Association of Community College Trustees, could conduct a CFCC Board training session to address the proper role of the members of the CFCC Board, an idea that Mr. Harris expressed his support of, contending that it would "take the pressure off" him to confront Mr. White, and agreed for Dr. Spring to speak with Mr. Hunter.

45.     Accordingly, during the month of October, 2014, Dr. Spring met with Donnie Hunter, informed him of Mr. White's behavior and requested his assistance.  Mr. Hunter, who shared Dr. Spring's concerns about the impacts of Mr. White's behavior, agreed to help, and training for Mr. White and other CFCC Board members was scheduled for February, 2015.

46.     James Norment is the attorney for the College, and during his tenure, Dr. Spring consulted with Mr. Norment regarding issues surrounding the College, including concerns about Mr. White, concerns that were also voiced to Mr. Norment by other members of the College's staff, fearing that Mr. White's conduct could impact the College's accreditation.

47.     In the Fall of 2014, a local television station, WECT, began running stories regarding travel and other related expenses incurred by public bodies and public officials, and

-13-

requested that the College provide copies of expenses associated with travel and other related expenses for Dr. Spring.

48.     Accordingly, WECT began running stories about the selection of office décor and lighting in the new Union Station building at the College, linking Dr. Spring to these choices even though the building was nearly complete and these purchases made before Dr. Spring's appointment as President of the College.

49.     In addition, WECT ran stories regarding Dr. Spring and his wife's attendance at the annual community college Presidents Academy Summer Institute, sponsored by the American Association of Community Colleges, attendance at which the College had approved for Dr. Spring and his wife prior to the execution of the Employment Contract.  WECT ran stories regarding upgraded seats (not First Class) that the College had paid for because of a medical condition suffered by Dr. Spring, credit card expenses incurred by Dr. Spring and mileage reimbursement paid to Dr. Spring for a donated car that had been provided to Dr. Spring.

50.     Dr. Spring did not create the policies and procedures at the College for incurring expenses or having expenses reimbursed.  After these reports, the CFCC Board informed Dr. Spring that he had the CFCC Board's "full support" and the College released statements that each of the items reported by WECT, including expense and mileage reimbursements, were in accordance with the policies and procedures at the College.  Nevertheless, Dr. Spring wanted public support from the CFCC Board and to tackle the media head on, believing that the timing of these reports could hurt the College, including capital campaigns being conducted by the College.  Accordingly, Dr. Spring requested that either Mr. Harris speak to the press, or that he (Dr. Spring) be permitted to.

51.     However, Dr. Spring was informed by Mr. White and other members of the CFCC Board that it would not be good for Dr. Spring to speak with WECT unless Dr. Spring was provided, in writing, a list of questions that the reporter intended to ask.  Mr. Harris, the CFCC Board Chair, informed Dr. Spring that he would not address the issues with the media. Accordingly, the media reports continued to run without any formal rebuttal from Dr. Spring or the CFCC Board.

52.     Without any public expression of support by the CFCC Board, and in an attempt to end any public debate, Dr. Spring voluntarily reimbursed the College for monies or reimbursements that Dr. Spring had received pursuant to College policy, including monies and expenses associated with his wife's travel.

53.     At or near the same time, CFCC Board member Louis Burney approached Camellia Rice, Vice President for Business and Institutional Services at the College, and requested documentation regarding Dr. Spring's expenses and related subjects, and told Rice not to inform Dr. Spring of his activities, requests which discredited Dr. Spring and undermined his standing with his staff.

54.     Mr. White was not the only trustee on the CFCC Board who overstepped his authority.  On or about November 11, 2014, Bill Turner, Vice-Chair of the CFCC Board, in a meeting attended by Mr. Harris, instructed Dr. Spring to increase the salaries of two (2) of Dr. Spring's staff members, and Dr. Spring informed him that this was something that he simply could not do without following the process for salary increases.  Mr. Turner then informed Dr. Spring that the CFCC Board wanted him to give these employees raises, and that if he didn't, then "maybe when you want something on down the road, the Board won't support you", a statement and directive which Dr. Spring took as another threat from another Board member.

55.     The very public debate by Mr. White regarding the need for the new Advanced and Emerging Technologies Center continued, with Mr. White continuing to contend that enrollment numbers were not as represented by Dr. Spring and others at the College, and that enrollment numbers were being manipulated.  As a vote by the Board of County Commissioners was looming, at the request of other members of the Board of County Commissioners, Dr. Spring prepared a rebuttal to Mr. White's comments, and Mr. Harris requested that Dr. Spring not send that rebuttal, telling Dr. Spring that he was "afraid of the ramifications" of "going up against Woody" and expressed fear of "what will he do to us down the road", believing that Mr. White would make the College's "life miserable."

56.     Mr. Harris cautioned Dr. Spring to "think about this" and asked him not to send the rebuttal, as requested by members of the Board of County Commissioners, stating that it would simply cause more problems with Mr. White, who would thereafter "challenge everything we say."  However, as requested by members of the Board of County Commissioners and the County Manager, Dr. Spring submitted his rebuttal, which conclusively showed that Mr. White's information was simply not accurate.

57.     In December, 2014, the business office at the College was informed that a member of the North Carolina State Auditor's office would be on campus, and as was his practice, Dr. Spring sent communications to members of the CFCC Board informing them of this visit.  However, just over an hour after Dr. Spring's email communications to CFCC Board members, Mr. White provided a copy of that email to WECT, who immediately reported this visit, and repeating the stories ran by WECT regarding mileage reimbursements received by Dr. Spring.

58.     In early January, 2015, Dr. Spring met in closed session with the CFCC Board to discuss all of the issues raised by WECT, and again, no one on the CFCC Board voiced any dissatisfaction with Dr. Spring's performance at the College, nor voiced any basis whatsoever for terminating his Employment Agreement. CFCC Board member David Ray only expressed a desire for increased communication between the CFCC Board and Dr. Spring.

59.     Mr. White's very public debate regarding the issuance of the bonds for the Advanced and Emerging Technologies Center continued into January, 2015, and the CFCC Board of County Commissioners scheduled January 20, 2015 as the date for the vote on the issuance of the bonds.

60.     Dr. Spring had attempted to schedule a meeting with Mr. White, as a member of the CFCC Board, to educate him about the enrollment numbers at the College that Mr. White had publically expressed concerns about, together with providing Mr. White additional information about the importance of this project for the College.  However, for unknown reasons, Mr. White refused to meet with Dr. Spring, informing him that he wanted all information to be provided to him in an open session.  However, as January 20, 2015, loomed and it became more apparent that Mr. White would lose his public fight with the College that he was to faithfully serve, Mr. White's desire to save face and avoid a public defeat increased.

61.     Mr. Harris, as Chair of the CFCC Board, informed Dr. Spring that "we need to find a way to let Woody save face", as Mr. Harris knew that Mr. White would lose the vote on the bonds.  Even though Mr. White had refused to meet with Dr. Spring to discuss Mr. White's concerns about enrollment numbers, prior to the January 20, 2015 meeting of the Board of County Commissioners, Mr. White met with Mr. Harris and asked the he talk with Dr. Spring about having a "confidential meeting" with the two of them (Mr. White and Mr. Harris), Mr.

Turner and Dr. Spring, a meeting that Mr. Harris characterized as an effort on Mr. White's part to "save face."

62.     Mr. Harris informed Dr. Spring that this "confidential meeting" would include a proposal by Mr. White that the College reduce its $40 million dollar request for the Advanced and Emerging Technologies Center by $5 million dollars, and that Mr. White guaranteed that he would get the County to replace that $5 million dollars from County reserves. Given especially that Mr. White had refused to meet with Dr. Spring, Dr. Spring did not believe it appropriate to meet with Mr. White "confidentially", and informed Mr. Harris that he would not be a part of a "back room meeting" with Mr. White that was designed to manipulate the public and save face for Mr. White, a decision that Mr. Turner, as Vice Chair of the CFCC Board, supported.

63.     In the weeks leading up to January 20, 2015, the public and negative comments by Mr. White continued, with Mr. White continuing to question whether this new training center was needed, contending that enrollment at CFCC for regular and continuing education had flattened, and stated in advance of the meeting that he would vote against the issuance of the bonds.

64.     On January 5, 2015, Dr. Spring made a presentation to the Board of County Commissioners regarding the Advanced and Emerging Technologies Center. In rebuttal, Mr. White made his own presentation to the Board of County Commissioners, contending that enrollment numbers provided by Dr. Spring were not accurate, citing his own investigation that there had been a "significant decrease" in the number of people attending community colleges in North Carolina, including the College. Mr. White urged the other members of the Board of County Commissioners to consider that when it voted on January 20, 2015, as against the other "increasing needs" of New Hanover County, contending that New Hanover County had fulfilled

its obligations under the 2008 bond, and despite the voters' approval, Mr. White contended that the Board of County Commissioners did not have to spend the money for the Advanced and Emerging Technologies Center; that the Board of County Commissioners had a duty to "contain our debt"; criticizing the "policy decisions" of the CFCC Board; and promoting "living within our means" and "weaning the government off of debt". Dr. Spring pointed out to the Board of County Commissioners that the enrollment numbers referred to by Mr. White were not accurate. Mr. White, after he and the CFCC Board forced Dr. Spring's resignation, would later publicly state his "problem" with the enrollment numbers provided by Dr. Spring.

65. On January 20, 2015, the Board of County Commissioners undertook consideration of the issue, and after discussion, voted 4-1 to approve the issuance of the bonds, with Mr. White being the only vote against the issuance of the bonds. During the course of the County Commissioners' meeting that night, Mr. White continued his verbal assault against the project, citing the "lack of oversight over how the bond funds had been spent"; that the need for more assignable square footage at the College had been "ignored"; referenced the College budget that he had been provided as a member of the CFCC Board (that had not yet been released to the public) that would eventually be submitted to the New Hanover County Board of Commissioners for approval and funding; and stated that the Board of County Commissioners had to "make tough decisions and stem the addiction to debt that we [have] on a local level and really in every level of government[.]"

66. January 22, 2015 was a regularly scheduled meeting date for the CFCC Board, and at the beginning of the meeting, the CFCC Board voted to go into Executive Session, during which Dr. Spring was asked to leave.

67.     When Dr. Spring went into the lobby, he saw Chief of Police at the College, Dan Wilcox, who later informed Dr. Spring that he had been asked to attend the meetings in case something happened.  What happened thereafter did not warrant the presence of police, but were simply acts undertaken by the CFCC Board in furtherance of the threats that had been made to Dr. Spring about the "consequences" that he might suffer.

68.     After the initial closed session, the CFCC Board reconvened, discussed one item, then abruptly tabled the remaining agenda and returned to closed session, excluding Dr. Spring, but calling the acting director of human resources and the vice president of the College into the closed session.

69.     Thereafter, Dr. Spring was summoned into the closed session wherein he was informed by Mr. Harris that the CFCC Board had decided not to renew Dr. Spring's contract when it came up for renewal in November, 2015, and that accordingly, Mr. Harris instructed Dr. Spring to resign immediately so that he could begin looking for another job, or the CFCC Board would return to open session and fire him.

70.     Dr. Spring, stunned by this development, asked Mr. Harris whether he could have until the next morning to weigh his options, and Mr. Harris refused, stating once again that if Dr. Spring did not resign that night, the CFCC Board would return to open session and fire him.

71.     When Dr. Spring inquired of Mr. Harris what he had done to warrant termination, the only explanation provided by Mr. Harris was that "you did not do what we asked you to do", without further elaboration.

72.     Dr. Spring was denied the opportunity to review the Employment Agreement or consult with an attorney before being forced to make a decision.

73.     As a result of the duress, coercion, and fraud improperly leveled by the CFCC Board, Dr. Spring informed the CFCC Board that he was left with no choice but to resign.

74.     Dr. Spring's employment with the College is subject to the provisions of his Employment Agreement dated August 16, 2012, the relevant provisions of which provide for an "annual evaluation of the President during the spring semester of each year" and provide for termination of his employment "for cause" or at Dr. Spring's request, with "no less than sixty (60) days' notice."  Dr. Spring's Employment Agreement also entitles him to due process in the event of a "for cause" termination, requiring the Board of Trustees to provide Dr. Spring "with a written notice explaining the basis for the termination and the President's right to a hearing if so elected."  After being provided with this written notice, Dr. Spring was entitled to a period of five (5) days to respond, and to thereafter "appear before the Board" for a hearing, be represented by a "legal representative", and the right to "confront and cross-examine any adverse witness."  Only after being provided those protections would the Board issue a "written decision and determination based on evidence adduced at the hearing."

75.     In attendance during the closed session of January 22, 2015, were at least three (3) lawyers, including Mr. White and the College's attorney, Mr. Norment.  The statements made to Dr. Spring by Mr. Harris on January 22, 2015 were false, and known by him and the CFCC Board to be false.  The Board of Trustees could never have lawfully undertaken to terminate Dr. Spring on January 22, 2015, in open or closed session, as he had not been provided with the due process to which he was entitled, under the express provisions of his Employment Agreement and the law.

76.     Mr. Harris and other CFCC Board Members in attendance in the closed session knew these statements to be false, and intended Dr. Spring to rely on these false statements.

77.     Despite Dr. Spring's request to have until the next day to consider his options, that request was refused.

78.     Dr. Spring was provided no reasonable alternative other than to resign or be fired, and was not provided a choice as to the date of his resignation, and accordingly, without being given an opportunity to view the provisions of his Employment Agreement that entitled him to due process, or consult with legal counsel, Dr. Spring informed Mr. Harris that he would resign, and left the closed session to begin the preparation of a letter of resignation.

79.     A few minutes later, Dr. Spring was then summoned back into the closed session, whereupon Mr. Harris, on behalf of the CFCC Board, offered Dr. Spring, and Dr. Spring accepted, six (6) months of severance pay; a "neutral recommendation"; and a confidentiality/non-disparagement agreement so that neither party would make any negative comments against the other.

80.     Dr. Spring accepted that offer, and in reliance thereon, left the closed session, completed a letter of resignation and provided that letter of resignation to the CFCC Board.

81.     Dr. Spring's resignation was involuntary, as he was denied the opportunity to make a free choice whether to resign, including the effective date of his resignation.

82.     On or about February 4, 2015, Dr. Spring and his wife, Andrea, attended a meeting with Mr. Norment, the CFCC Board's attorney, and another attorney, at the office of Ward & Smith, P.A., and was provided a document entitled "Resignation and Release." Dr. Spring pointed out that the document contained provisions that were not part of Mr. Harris' offer of January 22, 2015, nor Dr. Spring's acceptance thereof.  Specifically, that agreement contained a provision requiring that the CFCC Board would be entitled to deduct from Dr. Spring's severance "the amount by which the independent auditor in published findings determines to be

-22-

in excess of the reasonable amount to which Spring was due under the Employment Agreement and applicable law." That provision had never been discussed with Dr. Spring, much less agreed upon by him. The "non-disparagement" provisions contained in Paragraph 5 were likewise not mutual, requiring only that Dr. Spring not disparage the CFCC Board or the College, and not vice versa. Similarly, the release provisions were not mutual.

83. As Dr. Spring was advised to do, he sought counsel, and after consultation with his attorney, minor edits, in accordance with Mr. Harris' offer of January 22, 2015 and Dr. Spring's acceptance, were provided to Mr. Norment on Friday, February 20, 2015.

84. That same day, Louie Burney, a member of the Board, had both written and oral communications with Ben David, New Hanover County District Attorney, asking that the District Attorney have the State Bureau of Investigation undertake an investigation of Dr. Spring based upon allegations made by an employee that she felt pressured by Dr. Spring to manipulate enrollment numbers.

85. Prior to Mr. Burney making that request, Dr. Spring had never been confronted with that allegation or given an opportunity to respond.

86. On February 24, 2015, the local media reported that call, and the District Attorney's call for an investigation into the allegations.

87. On February 24, 2015, the CFCC Board informed Dr. Spring's counsel that it considered the edits transmitted on February 20, 2015 to be a "counter-offer", and that accordingly, the severance offer made and accepted by Dr. Spring on January 22, 2015 was withdrawn.

88. By reason of the false statements made by Mr. Harris, on behalf of the CFCC Board, the duress and coercion practiced by the CFCC Board, and the subsequent withdrawal of

the severance offer made to Dr. Spring on January 22, 2015, Dr. Spring provided the CFCC Board a formal Notice of Rescission of his resignation on March 4, 2015.

89.     Members of the CFCC Board, including Mr. White, continued to make public comments to the media regarding Dr. Spring from and after the time he was forced to resign, once again without affording Dr. Spring due process, knowing that the continued public scrutiny would foreclose additional employment opportunities for Dr. Spring.

90.     Through his comments to the media, Mr. White made it clear that part of his motivation for his participation in the CFCC Board's role in forcing Dr. Spring's resignation and violating his right to due process was the public debate between him, Dr. Spring and others at the College over the issuance of the bonds.

91.     Certain members of the CFCC Board present on the evening of January 22, 2015, who were not lawyers, upon information and belief did not know the provisions of Dr. Spring's Employment Agreement, nor the requirement that he be provided due process prior to any efforts to terminate his employment, and relied upon the lawyers that were present, including Mr. White and Mr. Norment, to provide them this critical information.

92.     Upon information and belief, Mr. White led the efforts to force Dr. Spring's involuntary resignation, as this was precisely the consequence that Dr. Spring felt that Mr. White had threatened to pursue if Dr. Spring did not "fix" the negative publicity that Mr. White received from his conflicted position regarding the issuance of the bonds.  With Mr. White's sound defeat by a voting bloc of the New Hanover County Board of Commissioners of which Mr. White is not a part; with the media, voters and supporters of the College questioning Mr. White's conflicted position, both before and after the vote of the Board of County Commissioners on January 20, 2015, Mr. White and others on the CFCC Board that had

-24-

threatened Dr. Spring made good on that threat.

93.     Upon information and belief, White influenced other members of the CFCC Board to agree to force Dr. Spring's involuntary resignation.

94.     Dr. Spring was not afforded a meaningful opportunity to respond to any allegations against him on January 22, 2015 or to respond to the proposed action to force his resignation or face an unlawful termination.

95.     Dr. Spring has not been paid amounts called for under the Employment Agreement for the term beginning with his forced resignation and through the present.

96.     Furthermore, Dr. Spring had a reasonable expectation of having his Employment Agreement with the CFCC Board renewed prior to its set expiration of October 31, 2015, which was a bilateral expectation as demonstrated by the terms of the Employment Agreement, the satisfactory evaluations of Dr. Spring, and the repeated commendations Dr. Spring received from CFCC Board Chairman Jason Harris.

97.     But for the wrongful acts of the CFCC Board, Dr. Spring would have continued in his employment as President of the College, and would have enjoyed a renewal of the Employment Agreement and the benefits thereof.

98.     As a further result of the CFCC Board's wrongful actions, Dr. Spring was denied his Constitutional Right to Procedural Due Process, and has incurred significant damages as a direct and proximate result thereof, including his resignation coerced under unlawful duress and fraud, denial of prospective renewal of the Employment Agreement, lost wages, damage to his reputation, and incursion of legal fees.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

99.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1

through 98 as though fully set forth herein.

100. The Employment Agreement constituted a written contract between the CFCC Board and Dr. Spring.

101. The Employment Agreement was supported by good and valuable consideration and contained mutuality of obligation.

102. Dr. Spring faithfully, dutifully, and satisfactorily complied with all terms of the Employment Agreement and otherwise abided by all conditions of his employment, including College policies and procedures.

103. The CFCC Board materially breached its contract with Dr. Spring, by:

a.    failing to provide requisite notice of its intent to pursue termination provisions under paragraph 12(b);

b.    attempting or threatening to terminate Dr. Spring for reasons which do not constitute "cause" under the Employment Agreement;

c.    forcing Dr. Spring to resign under duress, coercion, and fraud, without the assistance of legal counsel or an opportunity to review the Employment Agreement;

d.    Denying Dr. Spring the right to a hearing, the assistance of legal counsel, and the right to confront and cross-examine any adverse witnesses.

e.    failing to employ Dr. Spring for the full term of the Employment Agreement;

f.    failing to pay Dr. Spring the amounts set forth in the Employment Agreement;

g.    failing to provide the opportunity for renewal of the Employment Agreement;

h.     failing to exercise good faith and fair dealing in carrying out the Employment Agreement; and

i.     by other ways to be shown at trial of this matter.

104.    As a direct and proximate result of the CFCC Board's breach of the Employment Agreement, Dr. Spring is entitled to be reinstated to his former position and recoup all lost wages and benefits of said position.

105.    As a direct and proximate result of the CFCC Board's breach of the Employment Agreement, Dr. Spring is entitled to an award of damages in an amount in excess of $25,000.00.

**SECOND CLAIM FOR RELIEF**
**(Violation of Right to Due Process/Violation of Constitutionally Guaranteed Liberty Interest – N.C. Const. art. I, § 19)**

106.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 105 as though fully set forth herein.

107.    Dr. Spring had a protected property interest under Article I, Section 19 of the North Carolina Constitution  in his continued employment by the CFCC Board, a state entity, as the Employment Agreement set forth a definite period of employment and provided for unilateral termination by the CFCC Board only "for cause," with "cause" generally identified therein.

108.    As a public employee, Dr. Spring enjoys a constitutionally guaranteed protected liberty interest in the right to pursue the occupation of his choice, and is entitled to due process prior to his employer undertaking any action against him that might stigmatize him and impair his right to pursue his occupation.

109.    Additionally, the Employment Agreement expressly contemplated extension of the employment term, by requiring the parties "to meet no less than ninety (90) days prior to the expiration" of the term "to discuss a new employment contract or an extension or renewal," and

"[u]nless otherwise extended or modified, the employment of the President, if held over after the Original Term expires, shall continue on a month-to-month basis[.]"

110.    As a result, Dr. Spring was entitled to due process or "fundamental fairness" by law, which included notice of the charges against him and an opportunity to be heard.

111.    The Employment Agreement also guaranteed Dr. Spring specific procedural due process rights, including "written notice explaining the basis for termination," Spring's "right to a hearing," the "right to be represented at the hearing by a legal representative" and "the right to confront and cross-examine any adverse witnesses."

112.    Additionally, Dr. Spring has a right to procedural due process when governmental action, such as that undertaken by the CFCC Board, threatens his liberty in his reputation and choice of occupation.

113.    The CFCC Board, in unlawfully forcing Dr. Spring's involuntary resignation with the use of fraud, duress, and coercion, and in the CFCC Board's subsequent communications to the media, district attorney, and the public, has made charges against Dr. Spring that seriously damage his standing and associations in the community and profession, and imposed on him a stigma that forecloses his freedom to take advantage of other employment opportunities.

114.    Therefore, prior to any attempt to dismiss Dr. Spring or disparage him to the public thereafter, he was entitled to notice of the charges against him and a meaningful opportunity to respond and be heard so that he was afforded the opportunity to clear his name.

115.    Without question, the CFCC Board denied Dr. Spring each and every one of the aforementioned rights to procedural due process despite his requests, in a gross, intentional violation of his constitutional rights.

116.    As a direct and proximate result of the conduct of the CFCC Board, in wrongfully and unconstitutionally coercing Dr. Spring's involuntary resignation without due process, and terminating his employment without due process or valid cause, and in thereafter causing the dissemination of stigmatizing and misleading information about him, Dr. Spring has suffered damages stemming from his loss of employment, lost wages, lost opportunities, and stigmatized reputation.

117.    No adequate state remedy exists for these state constitutional violations and damages suffered by Dr. Spring, and therefore a direct claim against the Defendant CFCC Board is required to afford Dr. Spring relief.

118.    Defendant CFCC Board has no immunity to this claim, and has otherwise waived immunity.

119.    As a direct and proximate result of the Defendant CFCC Board's violation of his rights to due process, Dr. Spring is entitled to reinstatement of his former position and an award of damages in an amount in excess of $25,000.00.

## THIRD CLAIM FOR RELIEF
**(Violation of Right to Due Process/Violation of Constitutionally Guaranteed Liberty Interest – 42 U.S.C. § 1983 – Individual Board Members in Official Capacity)**

120.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 119 as though fully set forth herein.

121.    Dr. Spring had a property interest protected by the federal Constitution in his continued employment by the CFCC Board, a government entity controlled by the individual CFCC Board members in their official capacities, as the Employment Agreement set forth a definite period of employment and provided for unilateral termination by the CFCC Board only "for cause," with "cause" generally identified therein.

122.     As a public employee, Dr. Spring enjoys a liberty interest protected by the federal Constitution in the right to pursue the occupation of his choice, and is entitled to due process prior to his employer, controlled by the individual CFCC Board members, undertaking any action against him that might stigmatize him and impair his right to pursue his occupation.

123.     The CFCC Board, by and through its individual members, was required to provide Dr. Spring a right to procedural due process before taking action to threaten his liberty interests in his reputation and choice of occupation.

124.     Prior to any attempt by the CFCC Board, by and through its individual members, to dismiss Dr. Spring or disparage him to the public thereafter, he was entitled to notice of the charges against him and a meaningful opportunity to respond and be heard so that he was afforded the opportunity to clear his name.

125.     The CFCC Board, by and through its individual members, denied Dr. Spring each and every one of his rights to procedural due process afforded by the federal Constitution.

126.     Dr. Spring is therefore entitled to injunctive relief, preliminary and permanent, as against the individual CFCC Board members in their official capacities, which includes the reinstatement of Dr. Spring to his former position and the right to an impartial hearing to restore his name and undo the damage and stigma caused by deprivation of that right.

127.     There is no adequate state law remedy affording Dr. Spring the specific injunctive relief requested, and Dr. Spring has otherwise exhausted all administrative remedies.

128.     Upon information and belief, Defendants have no immunity to this claim, and have otherwise waived immunity.

## FOURTH CLAIM FOR RELIEF
### (Attorneys' Fees – 42 U.S.C. § 1988)

129.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1

through 128 as if fully set forth herein.

130.    As set forth above, this is an action to enforce the provisions of 42 U.S.C. § 1983.

131.    Accordingly, Plaintiff seeks an award of his reasonable attorneys' fees pursuant to the provisions of 42 U.S.C. § 1988.

132.    Defendants have no immunity to this claim, and have otherwise waived immunity.

**FIFTH CLAIM FOR RELIEF**
**(Attorneys' Fees – N.C. Gen. Stat. § 6-19.1)**

133.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 132 as if fully set forth herein.

134.    This action contests a state action pursuant to state law.

135.    Accordingly, Plaintiff seeks an award of his reasonable attorneys' fees pursuant to the provisions of N.C. Gen. Stat. § 6-19.1.

136.    Defendants have no immunity to this claim, and have otherwise waived immunity.

**SIXTH CLAIM FOR RELIEF**
**(*In the Alternative* - Breach of Contract – Severance Agreement)**

137.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 136, and pleads *in the alternative* the following cause of action.

138.    Plaintiff and the Defendant Board reached an agreement on January 22, 2015, as to the terms of a severance package Plaintiff was to receive with mutual obligations.

139.    Specifically, Plaintiff and the Defendant Board reached an agreement that the Board would provide Plaintiff six (6) months of severance pay and a "neutral recommendation"; and the parties agreed to a mutual non-disparagement provision so that neither party would make

575 Military Cutoff Road, Suite 106 – Wilmington, North Carolina 28405
Case 7:15-cv-00084-BO   Document 103   Filed 08/12/16   Page 30 of 33

any negative comments against the other.

140.   At the time Dr. Spring agreed to accept the severance package and be bound by the non-disparagement provision, he had not yet tendered a resignation letter.

141.   Plaintiff's resignation, which was involuntary and the subject of coercion and fraud as previously set forth herein, was otherwise only effective upon submission of written notice pursuant to the terms of his Employment Agreement.

142.   The severance agreement of January 22, 2015 was supported by good and valuable consideration from both parties.

143.   The Defendants breached the severance agreement by failing to pay the Plaintiff six (6) month's severance pay, and upon information and belief have failed to abide by the non-disparagement provisions and/or neutral recommendation provisions of the severance agreement.

144.   The Plaintiff has been injured as a direct and proximate result of the Defendant's breach of the severance agreement, including damage to his reputation, standing in the community, and ability to obtain alternative employment.

145.   As a direct and proximate result of the Defendant CFCC Board's breach of the severance agreement, Dr. Spring is entitled to reinstatement of his former position and an award of damages in an amount in excess of $25,000.00.

146.   Defendants have no immunity to this claim, and have otherwise waived immunity.

**WHEREFORE**, Plaintiff respectfully prays unto the Court as follows:

1.   For injunctive relief against the individual CFCC Board members in their official capacities, including reinstatement of Plaintiff to his position as President of Cape Fear Community College and an opportunity to participate in a fair and impartial hearing to restore

his name;

2.    That Plaintiff be awarded damages in excess of twenty-five thousand dollars ($25,000.00);

3.    For pre and post-judgment interest on any award as allowed by law;

4.    For an award of attorneys' fees pursuant to 42 U.S.C. 1988, N.C. Gen. Stat. § 6-19.1, and applicable law;

5.    That the costs of this action be taxed by the Court against Defendants;

6.    For trial by jury on all issues so triable; and

7.    For such other and further relief as the Court deems just and proper.

Respectfully submitted this the 12th day of August, 2016.

**SHIPMAN & WRIGHT, LLP**
*Attorneys for Plaintiff*

By:    /s Gary K. Shipman
**GARY K. SHIPMAN**
N.C. State Bar No.: 9464
**KYLE J. NUTT**
N.C. State Bar No.: 43469
575 Military Cutoff Road, Suite 106
Wilmington, NC 28405
Telephone: (910) 762-1990
Facsimile: (910) 762-6752

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this the 12th day of August, 2016, I electronically filed the foregoing **SECOND AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filling to the following:

John M. Martin
William J. Austin, Jr.
WARD AND SMITH, P.A.
PO Box 7068
Wilmington, NC 28406-7068
Email: jmm@wardandsmith.com
Email: wja@wardandsmith.com
*Counsel for Defendants*

This the 212th day of August, 2016.

                      **SHIPMAN & WRIGHT, LLP**
                      *Attorneys for Plaintiff*

By:    /s/Gary K. Shipman
         Gary K. Shipman
         N.C. State Bar No.:  9464
         gshipman@shipmanlaw.com
         575 Military Cutoff Road, Suite 106
         Wilmington, NC 28405
         Telephone: 910-762-1990
         Facsimile:  910-762-6752